No. 25-11504

# United States Court of Appeals

*for the*

# Eleventh Circuit

OASIS CAPITAL, LLC,

*Plaintiff-Appellant,*

– v. –

NASON, YEAGER, GERSON, HARRIS & FUMERO, P.A.,
BRIAN S. BERNSTEIN, ESQ.,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
(HONORABLE AILEEN CANNON)

## BRIEF OF PLAINTIFF-APPELLANT

EVAN LOUIS FRANK
ALAN L. FRANK LAW ASSOCIATES, PC
135 Old York Road
Jenkintown, Pennsylvania 19046
(215) 935-1000

*Counsel for Plaintiff-Appellant*

COUNSEL PRESS (800) 4-APPEAL • (382502)

## U.S. COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT (CIP)

Oasis Capital, LLC *vs.* Nason Yeager Gerson Harris & Fumero, P.A. et al Appeal No. 25-11504

11th Cir. R. 26.1-1(a) requires the appellant or petitioner to file a Certificate of Interested Persons and Corporate Disclosure Statement (CIP) with this court within 14 days after the date the case or appeal is docketed in this court, and to include a CIP within every motion, petition, brief, answer, response, and reply filed. Also, all appellees, intervenors, respondents, and all other parties to the case or appeal must file a CIP within 28 days after the date the case or appeal is docketed in this court. **You may use this form to fulfill these requirements.** In alphabetical order, with one name per line, please list all trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this case or appeal, including subsidiaries, conglomerates, affiliates, parent corporations, any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party. ***(Please type or print legibly)***:

Alan L. Frank Law Associates, P.C.

Bernstein, Brian S.

Cole, Scott & Kissane P.A.

Frank, Alan L.

Frank, Evan L.

Goldstein, Jeremy

Long, Adam

LSS Law

Maldonado, Sheena

Nason Yeager Gerson Harris & Fumero, P.A.

Postman, Barry

Shelomith, Zach B.

Vine, Jonathan

Submitted by:

Signature: /s/ Evan L. Frank

Name: Evan L. Frank, Esq. Prisoner # (if applicable): ____________

Address: 135 Old York Road, Jenkintown, PA 19046

Telephone #: 215-935-1000

## STATEMENT REGARDING ORAL ARGUMENT

Appellant requests oral argument. Oral argument would be beneficial because the first issue raised has not been addressed by Florida courts.

# TABLE OF CONTENTS

Page


CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENTT

STATEMENT REGARDING ORAL ARGUMENT ..... i

TABLE OF CONTENTS ..... ii

TABLE OF AUTHORITIES ..... v

A. Statement of Subject-Matter and Appellate Jurisdiction. ..... 1

B. Statement of the Issues ..... 2

C. Statement of the Case ..... 3

a. Proceeding and Disposition in the District Court ..... 3

b. Statement of Facts ..... 7

i. All four of Oasis' requested jury instructions dealt with the scenario in which the situation was ambiguous – that is, the parties did not discuss a UCC-1 ..... 12

c. Standard of Review ..... 14

Whether Florida courts would adopt a rule that transaction attorneys have a duty to file a UCC-1 financing statement for a secured loan ..... 14

Refusal of the District Court's refusal to give requested jury instructions ..... 15

Review of the District Court's grant of a directed verdict ..... 15

D. Summary of Argument ..... 16

Attorney's duty to file a UCC-1 financing statement ..... 16

Instruction that a lawyer may reveal confidential information to serve the client's interest unless the client instructs otherwise ..... 17

Instructions on resolving ambiguities in the attorney-client relationship ........ 18

Directed verdict on breach of contract ........ 19

Directed verdict on limitation of damages ........ 20

E. Argument ........ 21

a. Filing a UCC-1 financing statement is important because unperfected secured creditors are treated as unsecured creditors in bankruptcy ........ 21

b. Other state appellate courts have held that transaction attorneys must file UCC-1 financing statements for their clients' secured loans ........ 22

c. Under Florida law, a lawyer cannot disregard matters that signify potential legal problems, even if they do not arise precisely within the scope of representation ........ 26

d. Like Florida courts, the courts of Georgia, Illinois, and New York hold that violating a bar rule alone is not malpractice. Since the four states have the same rule, this is not a reason for Florida to have a different rule on UCC-1 statements ........ 28

e. Attorney work on out-of-state transactions is another reason for Florida to impose the same duty as other states ........ 29

f. There is no evidence that Georgia, Illinois, and New York have had problems with disclosure of client confidences due to their rules obligating attorneys to file UCC-1 financing statements ........ 30

g. Requiring the attorney to file a UCC-1 financing statement is consistent with Florida law requiring the attorney to communicate to the client and resolving ambiguity in favor of the client ........ 30

Florida Bar Rule 4-1.2(c) ........ 30

Retainer agreements are construed in favor of the client and against the lawyer ........ 31

h. Filing a UCC-1 financing statement can only have positive effects for the client ........ 32

i. The Court should certify the question to the Supreme Court of Florida.....32

j. Standard for refusal to give a requested jury instruction.....32

k. The District Court erred in not including a jury instruction correcting Defendant's expert's misstatement about the Florida Bar Rules.....33

l. The District Court erred in refusing to give an instruction on how to resolve ambiguity in the terms of the attorney-client relationship.....35

i. Both instructions are correct statements of Florida law.....35

ii. The issue was properly before the jury.....36

iii. Refusing these instructions prejudiced Oasis.....37

m. The District Court erred in granting Defendants' directed verdict motion on breach of contract.....40

n. The District Court erred in granting a directed verdict limiting damages.....43

F. Conclusion.....44

CERTIFICATE OF COMPLIANCE.....45

CERTIFICATE OF FILING AND SERVICE.....46

## TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Allen v. Lefkoff, Duncan, Grimes & Dermer P.C.*,
265 Ga. 374, 453 S.E.2d 719 (1995) ....................29

*Arabia v. Siedlecki*,
789 So. 2d 380 (Fla. 4th DCA 2001) .................... 18, 31, 36

*Atkin v. Tittle & Tittle*,
730 So. 2d 376 (Fla. 3d DCA 1999) ....................27

*Barnes v. Turner*,
278 Ga. 788 (2004) .................... 16, 22, 23, 24

*Bivens Gardens Office Bldg. v. Barnett Banks, Inc.*,
140 F.3d 898 (11th Cir. 1998) ....................15

*Brink v. Direct*,
38 F.4th 917 (11th Cir. 2022) .................... 19, 33, 36, 38, 39

*Cohen v. Kachroo*,
115 A.D.3d 512, 981 N.Y.S.2d 711 (App. Div. 1st Dept. 2014)....................29

*Daugherty v. Runner*,
581 S.W.2d 12 (Ky. App. 1978) .................... 27, 28

*Deb-Jo Constr. v. Westphal*,
620 N.Y.S.2d 678 (App. Div. 4th Dept. 1994).................... 16, 22, 25, 26

*Fernandes v. Barrs*,
641 So. 2d 1371 (Fla. 3d DCA 1994),
overruled on other grounds at *Chandris, S.A. v. Yanakakis*,
668 So. 2d 180, 185 (Fla. 1995).................... 20, 43-44

*Fid. Interior v. Se. Carpenters*,
675 F.3d 1250 (11th Cir. 2012) .................... 15, 33

*Goldsmith v. Bagby Elevator Co.*,
513 F.3d 1261 (11th Cir. 2008) .................... 15, 33

*Goulah v. Ford Motor*,
118 F.3d 1478 (11th Cir. 1997) ....................39

*In re Biloxi Casino*,
368 F.3d 491 (5th Cir. 2004) ....................21

*In re Eng. Motor*,
426 B.R. 178 (Bankr. N.D. Miss. 2010) ....................22

*In re First T.D.*,
253 F.3d 520 (9th Cir. 2001) ....................22

*Jaye v. Royal Saxon*,
687 So. 2d 978 (Fla. 4th DCA 1997) .................... 18, 31, 36

*JBJ Inv. v. S. Title Grp.*,
251 So. 3d 173 (Fla. 4th DCA 2018) .................... 16, 26

*Kartikes v. Demos*,
214 So. 2d 86 (Fla. 3d DCA 1968) .................... 40, 41

*Lory v. Parsoff*,
745 N.Y.S.2d 218 (App. Div. 2d Dept. 2002).................... 16, 22, 25, 26

*Maillard v. Dowdell*,
528 So. 2d 512 (Fla. 3d DCA 1988) ....................27

*Owens v. McDermott*,
316 Ill. App. 3d 340, 249 Ill. Dec. 303, 736 N.E.2d 145 (2000).................... 28-29

*Practical Offset, Inc. v. Davis*,
83 Ill. App. 3d 566 (1980).................... 16, 22, 24, 25

*Pressley v. Farley*,
579 So. 2d 160 (Fla. 1st DCA 1991).................... 18, 28, 34

*Rich v. Med-National Inc.*,
1998 U.S. App. Lexis 1344 (10th Cir. Jan. 30,1998).................... 37, 38

*S & D Petroleum v. Tamsett*,
534 N.Y.S.2d 800 (App. Div. 3d Dept. 1988).................... 17, 29

*Solomon v. Meyer*,
116 So. 2d 37 (Fla. 3d DCA 1959) ....................42

*Thomas v. Bryant*,
614 F.3d 1288 (11th Cir. 2010) ....................14

*United States v. Beach*,
228 F. App'x 816 (10th Cir. 2007) ....................21

*Vargas v. Schweitzer-Ramras*,
878 So. 2d 415 (Fla. 3d DCA 2004) .................... 18, 31, 36

*Wachovia Sec. v. Loop Corp.*,
726 F.3d 899 (7th Cir. 2013) .................... 21

*Weekley v. Knight*,
116 Fla. 721 (1934) .................... 2, 19, 40, 41, 42

**Statutes & Other Authorities:**

11 U.S.C. § 544 .................... 22

11 U.S.C. § 544(a) .................... 21

11 U.S.C. § 547 .................... 9

11 U.S.C. § 547(b)(4)(A) .................... 9

28 U.S.C. § 1291 .................... 1

28 U.S.C. § 1332 .................... 1

Fla. Stat. § 679.3101(1) .................... 21

Florida Bar Rule 4.1.2(c) .................... 18, 30, 31, 35, 36

Florida Bar Rule 4.1-6(c) .................... 5, 17

Florida Bar Rule 4.1-6(c)(1) .................... 5, 12, 17, 33, 35

Florida Bar Rule 4.6-6 .................... 31

Florida Bar Rules, Chapter 4, Preamble, Terminology .................... 31

Uniform Commercial Code § 9-302 .................... 26

Uniform Commercial Code § 9-401(1)(c) .................... 26

**A. Statement of Subject-Matter and Appellate Jurisdiction.**

The Court has subject matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity of citizenship and the amount in controversy exceeds $75,000 exclusive of costs and interest. The citizenship of the Plaintiff-Appellant, Oasis Capital LLC, is Puerto Rico because it is a limited liability company and its only member is an individual whose citizenship and domicile is Puerto Rico. Doc 23 - pg 3, ¶ 4. The citizenship of the individual Defendant-Appellee, Brian Bernstein, is Florida because he is domiciled in Florida. Id., pg 11, ¶ 33. The citizenship of the law firm Defendant-Appellee, Nason Yeager Gerson Harris & Fumero, P.A., is Florida because it is a professional association and every member is an individual domiciled in Florida. Id., pg 4-10, ¶¶ 6-31. Alternatively, if the law firm were considered a corporation, its only citizenship would still be Florida because its state of incorporation is Florida and its principal place of business is Florida. Id., pg 3, ¶ 4.

This Court has jurisdiction under 28 U.S.C. § 1291 because this is an appeal from a final judgment of the District Court disposing of all claims. Final judgment was entered on April 7, 2025 after a jury verdict. Doc 245. Oasis filed a notice of appeal on April 30, 2025. Doc 256.

**B. Statement of the Issues.**

1. Under Florida law, does a transaction attorney have a duty to file a UCC-1 financing statement for a client's secured loan. This is a case of first impression under Florida law, but appellate courts have answered Yes in Georgia, New York, and Illinois. The issue arises in two procedural postures: the District Court denied Oasis' motion for summary judgment as to this issue and refused a jury instruction modeled on Oasis' proposed holding.

2. The District Court erred in refusing three other jury instructions:

   a. instruction that an attorney must obtain informed consent in writing to limit the scope of representation.

   b. instruction that ambiguities in the scope of representation are construed against the attorney.

   c. instruction that an attorney may reveal confidential information to the extent the attorney reasonably believes necessary to serve the client's interests unless the client specifically requests it not be disclosed.

3. Under the Florida Supreme Court decision, *Weekley v. Knight*, the District Court erred in entering a directed verdict dismissing the breach of contract claims because Oasis' proprietor testified that he told the attorneys to file a UCC-1 financing statement and that the attorneys agreed to do so.

4. The District Court erred in entering a directed verdict limiting Oasis' damages.

**C. Statement of the Case.**

**a. Proceeding and Disposition in the District Court.**

On December 13, 2022, Oasis filed this malpractice case against its former attorney and his firm. Doc 1. The operative complaint is the February 22, 2023 Second Amended Complaint. Doc 23. The operative answer is the October 25, 2023 Amended Answer. Doc 58.

On May 14, 2024, both sides filed competing summary judgment motions. Doc 130 and 132. Oasis' motion argued in this case of first impression that a Florida court would follow the courts of Georgia, Illinois, and New York and hold that it is a transaction attorney's responsibility to file a UCC-1 financing statement for a secured transaction. Doc 132 - pg 2 and 9-11. The attorneys agreed that there was no Florida Supreme Court or appellate court decision on this issue but argued that a Florida court would not so hold. Doc 140 - pg 7-8.

On January 15, 2025, the District Court entered an omnibus order on summary judgment and *Daubert* motions. Doc 190. The District Court granted Oasis' motion in part, striking the attorneys' in pari delicto defense. Id., pg 14-15. However, the District Court otherwise denied both summary judgment motions. Id., pg 15 and 19.

The District Court denied Oasis' motion regarding a duty to file a UCC-1 financing statement. Id., pg 10-11. The District Court reasoned that the issue was best left for a Florida court and that it would not take a substantive position on the issue: "Whether the Florida Supreme Court or Florida intermediate appellate courts ultimately elect to adopt a per se rule in this context is a matter best left for those courts, and this Order should not be read as taking a substantive position on the merits or demerits of such a rule." Id., pg 11.

On March 26, 2025, the parties submitted joint and disputed jury instructions. Doc 218. A 5-day jury trial was held from March 31 to April 4, 2025. On April 3, 2025, the court held a charging conference. Final instructions were read to the jury on April 4, 2025. Doc 240. The court refused to include the following instructions that Oasis requested both in the pretrial submission (Doc 218) and at the charging conference:

Proposed instruction 21:

> A lawyer is responsible for filing a UCC-1 financing statement to perfect a client's secured loan. A lawyer has this responsibility even if the client did not specifically request that the lawyer file a UCC-1 financing statement.

Doc 265 - pg 141:14 – 142:7; Doc 218, pg 39.

Proposed instruction 22:

> If a lawyer wishes to limit the scope of his representation, he must obtain the 'informed consent' of his client in writing. 'Informed consent' means that the client agreed after the lawyer communicated

> adequate information and explanation about the risks and reasonably available alternatives to the proposed course of conduct.

Doc 265 - pg 142:10 – 144:11; Doc 218, pg 40.

> Proposed instruction 33:
>
> Ambiguity in the terms of representation is construed against the attorney and in favor of the client. An attorney must be clear and precise in explaining the terms of representation to the client. If the terms are unclear, then they are construed against the attorney and in favor of the client.

Doc 265 - pg 154:15 – 156:3; Doc 218, pg 53.

The court also refused to include one instruction that Oasis requested during the trial:

> A lawyer may reveal confidential information, to the extent the lawyer reasonably believes necessary to serve the client's interests, unless it is information the client specifically requires not to be disclosed.

Doc 265 - pg 111:2-6. The requested instruction was verbatim Florida Bar Rule 4.1-6(c) and its first subsection, 4.1-6(c)(1). Oasis requested this instruction after the attorneys' liability expert testified (incorrectly) that the Florida Bar required the opposite:

> The Florida Bar recognizes a very, very broad and -- but focused obligation which is sacred, and that is that anything, communications, documents, feelings, views, objectives, anything your client tells you, anything your client tells you is confidential. And so any information that would be included within that confidential information that would otherwise be filed publicly, let alone even privately, would be something that he would have -- would have needed an **express authorization**.

Doc 265 - pg 84:1-9 (emphasis added). Oasis requested the instruction after the expert's testimony and again at the charging conference. Id., pg 110:16 – 112:12, 156:4-24.

On April 2, 2025, the attorneys moved in part for a directed verdict at the close of Oasis' case. Doc 264 - pg 236:18 – 240:9 and 241:3 – 287:14; Doc 235. The court granted the motion in part and dismissed the breach of contract claims (Doc 265 - pg 4:15 – 7:5). During argument on the directed verdict motion, Oasis withdrew the standalone count for respondeat superior based on an agreement on the record that if there were a finding of malpractice, it would apply to both the attorney and the firm. Doc 265 - pg 264:13 – 265:10. On April 3, 2025, the attorneys renewed their directed verdict motion. Doc 265 pg - 113:24 – 121:13. The court granted the renewed motion in part: the court limited Oasis' damages for the omitted UCC-1 financing statement to $2,450,000, which represents the difference in distributions from the bankruptcy estate if Oasis were a secured creditor ($2,750,000) versus an unsecured creditor ($300,000). Id., pg 158:25 – 163:12.

On April 4, 2025, the jury returned a defense verdict on the remaining claims, professional negligence and breach of fiduciary duty. Doc 243. Final judgment was entered on April 7, 2025. Doc 245. Oasis filed a notice of appeal on April 30, 2025. Doc 256.

**b. Statement of Facts.**

Oasis' proprietor, Adam Long, was introduced to Brian Bernstein, Esq. on May 1, 2020. Doc 263 - pg 210:15-18. On May 5, 2020, following a conflicts check, Oasis formally retained Bernstein and his firm. Doc 263 - pg 220:19-21. Bernstein started work immediately, beginning with a transaction not the subject of the alleged malpractice: a transaction between Oasis, a company called Jaguar Health, and Jaguar's subsidiary NAPO Pharmaceuticals. Doc 262 - pg 210:22-25. The attorney-client relationship lasted from May 5, 2020, until sometime in the fall of 2021. Doc 263 - pg 255:9-12.

The law firm did in fact file a UCC-1 financing statement for Oasis for the Jaguar/NAPO transaction, the very first transaction on which the firm represented Oasis. Doc 262 - pg 213:23 – 221:17; P-58. The firm filed the UCC-1 financing statement on May 15, 2020, which was either the same day or within a few days of that transaction's closing. Id., pg 220:1-7.

On February 17 and July 8 of 2021, Oasis extended two secured convertible promissory notes to a now-bankrupt company called Generex. Doc 248-2 and 248-4. Bernstein prepared both promissory notes. Doc 263 - pg 252:7-13. The two notes had a combined principal amount totaling $2,774,500. Doc 248-2 - pg 1; Doc 248-4 - pg 1. The two notes are substantially identical, other than the date and amount. *See generally*, id. Both granted Oasis "a security interest in all of the

Company's (including its subsidiaries) Accounts, Goods, Inventory, Equipment, Investment Property, General Intangibles, Instruments, Documents, and all other assets and personal property of the Company, wherever located …" Doc 248-2 - pg 2; Doc 248-4 - pg 2. Both notes gave Oasis "the right to file a UCC-1 financing statement …" Id.

No UCC-1 financing statement was filed at the time of the notes, February 17 and July 8 of 2021, neither by Oasis nor by Bernstein. Doc 262 - pg 250:15-19; Doc 217 - pg 6, ¶ 13. Oasis did file a UCC-1 financing statement much later, on January 25, 2022. Doc 263 - pg 37:15-19. Doc 137 - pg 2, ¶ 13. Oasis did so through different counsel, not through the attorneys in this case. Doc 263 - pg 198:14-19. Oasis filed the UCC-1 financing statement once it learned that none was filed. Id., pg 37:15-19. However, by that time the UCC-1 financing statement was 342 days after the first note and 201 days after the second. Doc 36-1, p. 3.

Generex was publicly traded. Doc 262 - pg 206:15 – 207:21. Generex filed an 8-K shortly after each note. Doc 248-19; Doc 248-7. Bernstein billed time for reviewing the 8-K's. Doc 248-6 - pg 1; Doc 248-8 - pg 1. The 8-K's disclosed that there was a convertible promissory note, the principal amounts, interest rate, and other metrics, although neither named "Oasis". Doc 248-19 - pg 2; Doc 248-7 - pg 3. The second 8-K stated that the note was "secured" (Doc 248-7 - pg 3) but the first 8-K did not (Doc 248-19 - pg 2).

On April 23, 2022, Generex's other creditors filed an involuntary bankruptcy petition. Doc 137 - pg 3, ¶ 16. The involuntary bankruptcy petition was precisely 88 days after the late UCC-1 financing statement. Doc 36-1 - pg 3. The timing was important because it was just within the 90-day preference period under the Bankruptcy Code. 11 U.S.C. § 547(b)(4)(A). On April 4, 2023, Generex's bankruptcy trustee filed an avoidance action against Oasis, claiming that the late UCC-1 financing statement was an avoidable preference under section 547 because it secured existing debt within 90 days prior to the bankruptcy and the UCC-1 was not substantially contemporaneous with the notes. Doc 28-1. On April 11, 2023, the trustee moved for summary judgment on the avoidance action. Doc 28-2.

On August 15, 2023, the bankruptcy court granted the trustee's motion for summary judgment. Doc 36-1. The bankruptcy court held that Oasis was an unsecured creditor rather than a secured creditor. Id., pg 13. The bankruptcy court agreed with the trustee that the UCC-1 was not substantially contemporaneous with the notes and held that it was therefore an avoidable preference under section 547 of the Bankruptcy Code. Id., pg 8-13.

At trial of this malpractice action, the parties stipulated that (1) as a secured creditor, Oasis would have received $2,750,000 from the bankruptcy estate, (2) as an unsecured creditor, Oasis would receive $300,000 from the bankruptcy estate, and (3) the difference between the two was $2,450,000. Doc 240 - pg 14; Doc 263

- pg 43:25 – 44:17. The stipulation was read to the jury on the second day of the trial and then again as a jury instruction before deliberations. Id.

The above facts were all undisputed. The main disputes at trial were (1) what the parties said (or did not say) to each other about filing a UCC-1 financing statement, and (2) in what circumstances a lawyer has a duty to file a UCC-1. On the first issue – what was said or not said – both sides' accounts were based only on alleged verbal communications because there was no writing from the attorneys to Oasis or vice versa about filing or not filing a UCC-1 financing statement. Doc 263 - pg 84:17 – 85:23; Doc 264 - pg 24:15-16.

Adam Long, the proprietor of Oasis, testified that he told Mr. Bernstein to file a UCC-1 and that Mr. Bernstein agreed to do so. Doc 262 - pg 241:8 – 242:5. Mr. Bernstein submitted two pretrial declarations indicating that the parties never discussed filing a UCC-1 financing statement. Doc 141-1, ¶ 9 ("Adam Long did not discuss filing a UCC-1 financing statement in connection with the either the February 17, 2021 Generex transaction nor the July 8, 2021 Generex transaction.", ¶ 11 ("I did not have discussions with anyone else at Plaintiff on whether to file a UCC-1 financing statement in connection with the Generex transactions."); Doc 131-13, ¶ 5 ("Long did not request that I file a UCC-1 financing statement …"), ¶ 6 ("Long did not instruct me to file a UCC-1 financing statement …"), ¶¶ 8 and 9 (same).

However, at trial Mr. Bernstein testified that Mr. Long specifically told him not to file a UCC-1 financing statement. Doc 264 - pg 24:3-14. After this testimony, Mr. Bernstein was impeached with one of his declarations. Id., pg 56:18 – 62:7.

Each side offered expert testimony on a lawyer's duty (or lack thereof) to file a UCC-1. Plaintiff's liability expert testified that a transaction attorney must file a UCC-1 financing statement even without instructions from the client. Doc 264 - pg 162:17 – 167:4. Defendant's liability expert testified that an attorney should not and could not file a UCC-1 financing statement without explicit authorization. Doc 265 - pg 83:23 – 84:16, 86:9-16. Defendant's expert testified that an attorney has a duty to file a UCC-1 financing statement only if the client expressly instructs the attorney to do so – and in fact that is the only circumstance in which an attorney is even permitted to do so. Doc 265 - pg 84:10-16, 86:9-16, 92:13-17. Defendant's expert testified that a UCC-1 financing statement could reveal confidential information and that the Florida Bar prohibits a lawyer from revealing confidential information without the client's explicit authorization:

> The Florida Bar recognizes a very, very broad and -- but focused obligation which is sacred, and that is that anything, communications, documents, feelings, views, objectives, anything your client tells you, anything your client tells you is confidential. And so any information that would be included within that confidential information that would otherwise be filed publicly, let alone even privately, would be something that he would have -- would have needed an <u>**express authorization**</u>.

Doc 265 - pg 84:1-9 (emphasis added).

The relevant Florida Bar Rule actually states the opposite – Rule 4.1-6(c)(1) explicitly allows a lawyer to disclose confidential information without the client's permission, unless the client has specifically instructed the lawyer not to disclose it: "A lawyer may reveal confidential information to the extent the lawyer reasonably believes necessary to: (1) serve the client's interest unless it is information the client specifically requires not to be disclosed …". Florida Bar Rule 4.1-6(c)(1). After this testimony, Plaintiff requested a jury instruction modeled on Florida Bar Rule 4.1-6(c)(1), but the District Court refused to include this instruction. Doc 265 - pg 110:16 – 112:12, 156:4-24.

**i. All four of Oasis' requested jury instructions dealt with the scenario in which the situation was ambiguous – that is, the parties did not discuss a UCC-1.**

All four of Oasis' requested jury instructions dealt with the scenario in which the parties were silent about a UCC-1: Proposed instruction 21 (the attorney must file a UCC-1 even without instructions), proposed instruction 22 (the attorney must obtain informed consent in writing to limit the scope of representation), proposed instruction 33 (ambiguities in the scope of representation are construed against the attorney), and an instruction requested during trial (attorneys permitted to disclose confidential information to protect the client unless the client specifically instructs otherwise).

Although Mr. Bernstein testified at trial that he was instructed not to file a UCC-1, had the jury been given the requested instructions, by far the more likely finding was that, as Mr. Bernstein alleged in his declaration, the parties never discussed a UCC-1 financing statement. In this ambiguous situation, in the absence of these specific instructions, the jury found for the attorneys.

First, Mr. Bernstein was directly impeached based on one of his specific declarations to the court – his declaration was that there was no discussion, but then at trial he testified that there was. Doc 264 - pg 56:18 – 62:7. Second, the jury asked a question during deliberations about the firm filing a UCC-1 without input from the client: "Are we able to see Bernstein's testimony? Specifically looking for Alan Armour [another attorney at the firm] filing UCC-1, and it was the firm's decision to do the filing without input of client. I believe it was plaintiff attorney questioning. If I am incorrect with this testimony, please let me know." Doc 266 - pg 74:8-13. (The question refers to the testimony at Doc 264 - pg 26:17 – 28:3 and 80:1 – 81:20.) Third, the jury was shown the 8-K disclosures by Generex, (Doc 248-19; Doc 248-7) and the billing statements in which Bernstein charged Oasis for reviewing the 8-K's (Doc 248-6; Doc 248-8). An instruction to keep the notes confidential would not make sense given that Bernstein billed Oasis for reviewing Generex's public disclosures of the same information. Fourth, fifth, and sixth, Mr. Bernstein's testimony did not match (4) his own counsel's opening

statement, (5) his counsel's summation, or (6) his liability expert's testimony. The defense opening statement did not say that Mr. Bernstein was instructed not to file a UCC-1. Doc 262 - pg 185:4 – 200:5. Instead, the defense emphasized the absence of an instruction. Id., pg 186:2-19, 186:24 – 187:6, 193:25 – 194:8. The defense summation did not actually ask the jury to believe the testimony that there was an instruction from Oasis not to file a UCC-1. The defense summation did address the impeachment, Doc 266 - pg 63:19 – 65:3, but the argument was that the jury should not fault Mr. Bernstein for having an imperfect memory: "… he is a human being. People naturally tend to forget some things or remember them inaccurately. It's being a human.", id., pg 64:11-13. Sixth, the attorneys' liability expert also based his opinion on the lack of an instruction. Doc 265 - pg 83:23 – 86:22. He testified that he believed the attorneys were not retained to file a UCC-1 because he did not see a written instruction to the contrary. Doc 265 - pg 107:21 – 109:14.

**c. Standard of Review.**

Whether Florida courts would adopt a rule that transaction attorneys have a duty to file a UCC-1 financing statement for a secured loan.

The question of whether the Supreme Court of Florida would follow the decisions in Georgia, Illinois, and New York and impose on a transaction attorney a duty to file a UCC-1 financing statement, is reviewed de novo because it is a question of law. *Thomas v. Bryant*, 614 F.3d 1288, 1307 (11th Cir. 2010). The

question arises in two procedural postures. First, the court denied Plaintiff's motion for summary judgment on this issue of law. Second, the court declined to include Plaintiff's proposed jury instruction 21, which was modeled on the holding that Plaintiff asked the court to adopt. The standard of review for a requested instruction is set out below.

Refusal of the District Court's refusal to give requested jury instructions.

"A refusal to give a requested jury instruction is erroneous only if (1) the requested instruction correctly stated the law, (2) the instruction dealt with an issue properly before the jury, and (3) the failure to give the instruction resulted in prejudicial harm to the requesting party." *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1287 (11th Cir. 2008) (quotations omitted). The legal correctness of a requested jury instruction is reviewed de novo. *Fid. Interior v. Se. Carpenters*, 675 F.3d 1250, 1259 (11th Cir. 2012).

Review of the District Court's grant of a directed verdict.

A district court's grant of a directed verdict is review de novo. *Bivens Gardens Office Bldg. v. Barnett Banks, Inc.*, 140 F.3d 898, 905 (11th Cir. 1998).

**D. Summary of Argument.**

Attorney's duty to file a UCC-1 financing statement.

The first issue is one of first impression in Florida: does a transaction attorney for a secured loan have a duty to file a UCC-1 financing statement. Appellate decisions in Georgia, Illinois, and New York have answered Yes, and neither side has found a decision answering No. *Barnes v. Turner*, 278 Ga. 788, 789 (2004) ("While Georgia's appellate courts have not previously addressed this issue, decisions from other states make clear that an attorney in Turner's position must at least file original UCC financing statements, even absent specific direction from the client. We agree."); *Practical Offset, Inc. v. Davis*, 83 Ill. App. 3d 566, 571 (1980); *Lory v. Parsoff*, 745 N.Y.S.2d 218, 219 (App. Div. 2nd Dept. 2002); *Deb-Jo Constr. v. Westphal*, 620 N.Y.S.2d 678, 679 (App. Div. 4th Dept. 1994). The Court should either follow these decisions or certify the question to the Supreme Court of Florida.

Although Florida courts have not specifically addressed a duty to file a UCC-1, that duty follows from the more general holding that an attorney cannot disregard matters that signify potential legal problems, even if those matters do not fall precisely within the scope of his employment. *E.g.*, *JBJ Inv. v. S. Title Grp.*, 251 So. 3d 173, 179 (Fla. 4th DCA 2018). An attorney who represents a client for a secured loan but fails to file a UCC-1 is ignoring an enormous risk to the client.

Even if the transaction attorney is not explicitly retained to perfect the security, failing to do so undermines the "secured" part of the client's loan.

Filing a UCC-1 financing statement can only help the client by perfecting the security interest – at worst, the financing statement has no practical effect if the debtor timely pays the debt. A contrary rule would be problematic for several reasons – among them, the Florida professional standard would be far beneath the standards elsewhere. The same conduct would satisfy a Florida transaction attorney's duty of care but be so clearly malpractice in New York that a plaintiff-client can win summary judgment on liability without a liability expert. *S & D Petroleum v. Tamsett*, 534 N.Y.S.2d 800, 801-02 (App. Div. 3rd Dept. 1988).

Instruction that a lawyer may reveal confidential information to serve the client's interest unless the client instructs otherwise.

The District Court refused an instruction that an attorney may reveal confidential information to protect the client's interest unless the client instructs otherwise. Doc 265 - pg 111:2-6. The instruction was legally correct because it was verbatim Florida Bar Rule 4.1-6(c) and subsection 4.1-6(c)(1). The instruction was important because the defense liability expert testified that the Florida Bar required the client's express authorization to reveal confidential information – implicitly prohibiting Mr. Bernstein from filing a UCC-1 for fear of disclosing confidential information. Doc 265 - pg 84:1-9.

Oasis did not request liability for violating a bar rule. The rule and the instruction are phrased permissively – what a lawyer is allowed to do – to correct the expert's misstatement about what the Florida Bar prohibits a lawyer from doing. Violating a bar rule is not by itself malpractice, although it can constitute evidence of negligence. *Pressley v. Farley*, 579 So. 2d 160, 161 (Fla. 1st DCA 1991). The District Court took this to mean that an instruction should not be used if the supporting authority was a bar rule. Doc 265 - pg 143:25 – 144:4, 156:14-16. This was an error because allowing an attorney to do something is different from holding the attorney liable for violating a bar rule.

<u>Instructions on resolving ambiguities in the attorney-client relationship.</u>

The District Court refused instructions 22 and 33, both addressing how to resolve ambiguities in the terms of the attorney-client relationship. Instruction 33 states that ambiguities in the terms of representation are construed in favor of the client and against the attorney (citing three cases so construing retention and fee agreements – *Arabia v. Siedlecki*, 789 So. 2d 380, 383 (Fla. 4th DCA 2001); *Jaye v. Royal Saxon*, 687 So. 2d 978, 982 (Fla. 4th DCA 1997); *Vargas v. Schweitzer-Ramras*, 878 So. 2d 415, 417 (Fla. 3d DCA 2004)). Instruction 22 states that an attorney must obtain written informed consent to limit the scope of representation (citing Florida Bar Rule 4-1.2(c) and the preamble's definition of "informed consent").

Oasis repeatedly argued that if both sides were silent about a UCC-1, Oasis should still prevail. Doc 262 - pg 178:21 – 179:32 (opening statement); Doc 264 - pg 162:17 – 165:16 (expert testimony); Doc 266 - pg 32:6-14 (summation); Doc 132 (summary judgment motion) - pg 10-11; Doc 143 (response to defense summary judgment motion) - pg 12-13. Without either instruction, and without the instruction that an attorney must file a UCC-1, the jury was not given a path to a plaintiff's verdict if the jury found that the parties were silent about whether to file a UCC-1. Although Oasis' counsel and expert said that Oasis should prevail if the parties were silent about a UCC-1, "an attorney's closing argument or an expert's testimony, no matter how accurate, is no substitute for an instruction issued by the court." *Brink v. Direct*, 38 F.4th 917, 925 (11th Cir. 2022). When the court does not instruct the jury on a basis for liability, that is prejudicial because "in this Circuit a jury is presumed to follow jury instructions." *Id.* at 924 (quotes omitted).

<u>Directed verdict on breach of contract.</u>

The District Court erred in granting a directed verdict on breach of contract under *Weekley v. Knight,* 116 Fla. 721, 722 (1934): "We think there can be no question that one has a cause of action ex contractu against an attorney who neglects to perform the services which he agrees to perform for a client or which by implication he agrees to perform when he accepts employment by a client." *Weekley v. Knight,* 116 Fla. 721, 722, 156 So. 625, 626 (1934). Mr. Long testified

that he instructed Mr. Bernstein to file a UCC-1 financing statement. The jury also saw evidence that the firm filed a UCC-1 for Oasis only about 10 days after being retained. Doc 248-9; Doc 262 - pg 213:23 – 221:17. The UCC-1 for the parties' first transaction showed the attorneys agreed implicitly, as did the fact that a UCC-1 is legally required for a secured loan to be secured. Mr. Long's testimony showed the attorneys agreed explicitly. Either basis for a contract claim was permitted under Florida law.

Directed verdict on limitation of damages.

The District Court erred in limiting Plaintiff's damages under *Fernandes v. Barrs*, 641 So. 2d 1371, 1376 (Fla. 3d DCA 1994) (overruled on other grounds at *Chandris, S.A. v. Yanakakis*, 668 So. 2d 180, 185 (Fla. 1995)), because a plaintiff can prove collectability "with evidence of the original tortfeasor's financial status, insurance coverage, property ownership, and so forth." *Fernandes*, 641 So. at 1376. Here, the evidence included the debtor's consolidated financial statements within 10-K and 10-Q filings showing assets above $40,000,000. Doc 248-12 - pg 97; Doc 248-13 - pg 3; Doc 248-25 - pg 3. The attorneys' damages expert admitted that the goodwill portion was tested at least once per year under GAAP (Doc 265 - pg 46:25 – 47:3, 49:8 – 50:23), that the company was audited under the highest possible standard, PCAOB (id., pg 31:13 – 32:10), and that in the view of

the accountant this value was unimpaired at the time of filing (id., pg 47:4 – 48:16, 50:15-16, 52:1-4, 52:12-21, 56:18-24, 57:17 – 58:2).

**E. Argument.**

**a. Filing a UCC-1 financing statement is important because unperfected secured creditors are treated as unsecured creditors in bankruptcy.**

When a creditor makes a loan secured by the debtor's property, the security interest in the property is not perfected unless the creditor files a UCC-1 financing statement. Fla. Stat. § 679.3101(1). A UCC-1 financing statement gives the public notice that a creditor has a security interest created by a security agreement. *United States v. Beach*, 228 F. App'x 816, 819 n.1 (10th Cir. 2007) (citing Black's Law Dictionary 568 (5th ed. 1979)). "The statement is filed with the Secretary of State and thus becomes public record." *Id.* The purpose of a financing statement is to put third parties on notice. *In re Biloxi Casino*, 368 F.3d 491, 499 (5th Cir. 2004).

Perfecting a secured loan is important (among other reasons) because in bankruptcy perfected secured creditors are paid first – however, unperfected secured creditors are relegated to the status of general unsecured creditors. "Under the basic principles of secured-transaction law, secured creditors must be paid in full before unsecured creditors retain any interest in a debtor's assets." *Wachovia Sec. v. Loop Corp.*, 726 F.3d 899, 907 (7th Cir. 2013) (quotes omitted). "Under 11 U.S.C. § 544(a), unperfected security interests are avoidable and can be relegated

to the status of general unsecured claims." *In re First T.D.*, 253 F.3d 520, 525 (9th Cir. 2001). "In other words, an unperfected security interest in personal property is treated under § 544 the same as an unsecured interest." *In re Eng. Motor*, 426 B.R. 178, 193 (Bankr. N.D. Miss. 2010).

**b. Other state appellate courts have held that transaction attorneys must file UCC-1 financing statements for their clients' secured loans.**

Decisions from the Supreme Court of Georgia and the intermediate appellate courts of Illinois and New York hold that transaction counsel has a duty to file a UCC-1 financing statement. *Barnes v. Turner*, 278 Ga. 788, 789, 606 S.E.2d 849, 851 (2004) ("While Georgia's appellate courts have not previously addressed this issue, decisions from other states make clear that an attorney in Turner's position must at least file original UCC financing statements, even absent specific direction from the client. We agree."); *Practical Offset, Inc. v. Davis*, 83 Ill. App. 3d 566, 571, 39 Ill. Dec. 132, 136, 404 N.E.2d 516, 520 (1980); *Lory v. Parsoff*, 296 A.D.2d 535, 536, 745 N.Y.S.2d 218, 219 (App. Div. 2nd Dept. 2002) ("An attorney's failure to file a UCC financing statement in the manner necessary to perfect his client's security interest constitutes malpractice as a matter of law"); *Deb-Jo Constr. v. Westphal*, 210 A.D.2d 951, 951, 620 N.Y.S.2d 678, 679 (App. Div. 4th Dept. 1994) (same).

The Supreme Court of Georgia cited Illinois and New York decisions on this issue as persuasive authority. *Barnes v. Turner*, 278 Ga. 788, 789 n.7, 606 S.E.2d 849, 851 (2004). In *Barnes v. Turner*, the client sold his business, with the majority of the payment coming from a 10-year secured promissory note. *Barnes v. Turner*, 606 S.E.2d 849, 850 (Ga. 2004). The attorney perfected the security interest by filing UCC financing statements. *Id.* Under Georgia law, financing statements were only effective for five years but could be renewed for an additional five years. *Id.* No renewal statements were filed, and the original statements lapsed. *Id.* The attorney neither informed the client nor filed renewal statements. *Id.* The debtor pledged the same collateral to two other creditors. *Id.* Those creditors filed financing statements and became senior to the client once the client's statements lapsed. *Id.* The debtor entered a Chapter 7 bankruptcy with money still owed under the promissory note. *Id.*

The trial court granted a motion to dismiss the malpractice case and the Court of Appeals affirmed. *Id.* Both lower courts reasoned that the only possible malpractice was failing to inform the client of the renewal requirement at the time of the original transaction, but that that was time-barred.

The state Supreme Court reversed. The court agreed with the decisions from other states that attorneys must at least file the original UCC financing statements: "While Georgia's appellate courts have not previously addressed this issue,

decisions from other states make clear that an attorney in Turner's position must at least file original UCC financing statements, even absent specific direction from the client. We agree." *Id.* at 851. The court further held that if the statements require renewal before full payment then the attorney has a duty regarding the renewal. *Id.* "Otherwise the unpaid portion of the purchase price becomes unsecured and the seller did not receive the protection he bargained for." *Id.* The attorney can fulfill that duty by either (1) informing the client of the renewal requirement or (2) renewing the financing statements himself. *Id.* at 852.

The Illinois appellate case cited by the Supreme Court of Georgia is *Practical Offset, Inc. v. Davis*, 83 Ill. App. 3d 566 (1980). In *Practical Offset v. Davis*, the appellate court affirmed summary judgment in favor of the client on liability. *Id.* at 575. The attorney-defendant represented the client-plaintiff in the sale of its assets. *Id.* at 567. The majority of the purchase price was to be paid over seven years. *Id.* The unpaid balance was secured by the equipment sold. *Id.* at 567-68. As in this case, the agreement provided for filing a UCC financing statement. *Id.* The attorney prepared the financing statement, but neither the attorney nor the client filed it until 11 months after the sale. *Id.* at 568. In the interim, the debtor pledged the same assets to another creditor, which did file its financing statement. *Id.* The attorney testified that he left it to the buyer's attorney to file the UCC financing statement. *Id.* at 569.

The appellate court affirmed summary judgment for the client on liability. The appellate court accepted the attorney's premise that "defendant was employed to act as plaintiffs' attorney in connection with the sale of plaintiffs' assets, and not specifically to file a financing statement." *Id.* at 571. The attorney contended that he was retained to prepare the security agreement and financing statement, but that he was not retained to file the financing statement. *Id.* These circumstances implied a duty for the attorney to file the UCC financing statement: "To require a specific direction by clients to their attorney to file such executed documents under such circumstances would be unrealistic. The only possible inference is that defendant's employment was broad enough to encompass the task of filing the financing statement." *Id.* The appellate court found the malpractice so clear that "we question whether expert testimony was necessary at all." *Id.* at 574. "A detailed knowledge of security interests or of professional customs would not be necessary to understand that if a piece of paper must be filed to protect your client's interests, and you entrust that task to an attorney for the other side without adequately following through to see that it is done, it is negligence." *Id.*

There are several New York decisions on the duty to file a UCC-1 at the appellate and trial level. The two New York decisions cited by the Supreme Court of Georgia are *Lory v. Parsoff*, 296 A.D.2d 535, 536, 745 N.Y.S.2d 218, 219-20 (App. Div. 2nd Dept. 2002) and *Deb-Jo Constr. v. Westphal*, 210 A.D.2d 951, 620

N.Y.S.2d 678 (App. Div. 4th Dept. 1994). Both are short opinions in which the plaintiff-client won summary judgment on liability and the appellate court affirmed. In *Lory v. Parsoff*, the court held, "An attorney's failure to file a UCC financing statement in the manner necessary to perfect his client's security interest constitutes malpractice as a matter of law." *Lory*, 745 N.Y.S.2d at 219. In *Deb-Jo v. Westphal*, the court held, "The failure of an attorney to file a financing statement in the manner required by law to perfect his client's security interest (Uniform Commercial Code §§ 9-302, 9-401 [1] [c] constitutes negligence or malpractice as a matter of law." *Deb-Jo Constr.*, 620 N.Y.S.2d at 679.

**c. Under Florida law, a lawyer cannot disregard matters that signify potential legal problems, even if they do not arise precisely within the scope of representation.**

Although Florida courts have not specifically addressed a duty to file a UCC-1, the duty follows from a more general holding under Florida law: an attorney cannot disregard matters that signify potential legal problems, even if those matters do not fall exactly within the scope of his employment. This rule has been stated in three appellate cases: in all three, the courts describe the scope of an attorney's duties on a real estate transaction, but then explain that an attorney cannot ignore potential legal problems that go beyond those duties. *JBJ Inv. v. S. Title Grp.*, 251 So. 3d 173, 179 (Fla. 4th DCA 2018) ("Once an attorney-client relationship is established, an attorney may not neglect to perform the services

which he agrees to perform or which by implication he agrees to perform when he accepts employment. Thus, an attorney may not disregard matters that arise and reasonably signal potential legal problems, even if those matters do not fall precisely within the general rule governing the scope of an attorney's duties when representing a client in a real estate transaction.") (citations and quotations omitted); *Atkin v. Tittle & Tittle*, 730 So. 2d 376, 378 (Fla. 3d DCA 1999) ("Moreover, *Maillard* does not avail Tittle, who assumed the duty to check out the contiguous lot rule. Although *Maillard* provides the general rule as to an attorney's duties when representing a client in a real estate transaction, that rule is not absolute. An attorney may not disregard matters that arise and reasonably signal potential legal problems although those matters may not fall precisely within the general rule. Tittle's failure to fulfil his duty competently to the Atkins rendered him negligent.") (citations omitted); *Maillard v. Dowdell*, 528 So. 2d 512, 515 (Fla. 3d DCA 1988) ("plaintiffs did not claim Dowdell completely disregarded matters coming to his attention which should reasonably have put him on notice that plaintiffs would have legal problems that were not precisely or totally within the scope of the task Dowdell was employed to perform.").

The earliest of the three was *Maillard v. Dowdell*, in which the court stated the rule but noted that the attorney did not run afoul of it. *Maillard*, 528 So. 2d at 515. *Maillard* relied on the out-of-state decision in *Daugherty v. Runner*, which

stated, "An attorney cannot completely disregard matters coming to his attention which should reasonably put him on notice that his client may have legal problems or remedies that are not precisely or totally within the scope of the task being performed by the attorney." *Daugherty v. Runner*, 581 S.W.2d 12, 17 (Ky. App. 1978).

There is no way to reconcile Florida's general rule that lawyers cannot disregard matters that signify potential problems, even matters technically outside the scope of their employment – with a specific rule that a lawyer has no duty regarding a UCC-1 financing statement.

**d. Like Florida courts, the courts of Georgia, Illinois, and New York hold that violating a bar rule alone is not malpractice. Since the four states have the same rule, this is not a reason for Florida to have a different rule on UCC-1 statements.**

The District Court declined to follow out-of-state decisions on the UCC-1 issue, citing Florida law (*Pressley v. Farley*, 579 So. 2d 160 (Fla. 1st DCA 1991)) that a bar rule violation by itself is not malpractice. Doc 190 - pg 11, n. 7. The District Court reasoned that this was an example of a case where Florida courts declined to adopt a per se rule. Id.

This was not a good reason for Florida to have a different rule on UCC-1's because Illinois, New York, and Georgia have the same rule as Florida: violations of their bar rules do not by themselves establish malpractice. *Owens v. McDermott*, 316 Ill. App. 3d 340, 353, 249 Ill. Dec. 303, 315, 736 N.E.2d 145, 157

(2000); *Cohen v. Kachroo*, 115 A.D.3d 512, 513, 981 N.Y.S.2d 711, 713 (App. Div. 1st Dept. 2014); *Allen v. Lefkoff, Duncan, Grimes & Dermer P.C.*, 265 Ga. 374, 374, 453 S.E.2d 719, 720 (1995).

**e. Attorney work on out-of-state transactions is another reason for Florida to impose the same duty as other states.**

Declining to adopt this rule would also create a situation in which members of other state bars, including the bar of a neighboring state, are held to a higher standard than members of the Florida bar. If a Florida attorney can meet the standard of care by doing something that is per se malpractice in another state, that is also problematic because transactions often cross state lines. Applied here, both notes had New York choice of law clauses (Doc 248-2 - pg 11), New York arbitration clauses (id.), and contemplated a security interest under the "New York Uniform Commercial Code" (id., pg 2.). Under New York law, not filing a financing statement is so clearly malpractice that a plaintiff-client can win summary judgment on liability against the attorney without even retaining an expert. *S & D Petroleum v. Tamsett*, 144 A.D.2d 849, 849-50, 534 N.Y.S.2d 800, 801-02 (App. Div. 3rd Dept. 1988). If Oasis had hired a New York attorney for the same transaction, the New York attorney would have been obligated as a matter of law to file UCC-1 financing statement on behalf of Oasis.

**f. There is no evidence that Georgia, Illinois, and New York have had problems with disclosure of client confidences due to their rules obligating attorneys to file UCC-1 financing statements.**

There is no indication that other states have had problems with disclosure of client confidences as a result of requiring attorneys to file UCC-1 financing statements for their clients' secured loans. In fact, there does not appear to be a single case in any state where a client complained that an attorney disclosed confidential information in a financing statement. So, if the Appellees' argument is along the lines of their expert's testimony, there do not appear to have been any improper disclosures of client confidences due to requiring attorneys to file financing statements.

**g. Requiring the attorney to file a UCC-1 financing statement is consistent with Florida law requiring the attorney to communicate to the client and resolving ambiguity in favor of the client.**

The attorney-client relationship is not balanced – the attorney is the professional and the client relies on the attorney's legal advice. The proposed rule is consistent with various doctrines under Florida law that construe ambiguities in favor of the client and impose on the lawyer the duty to communicate with clarity.

<u>Florida Bar Rule 4-1.2(c)</u>

Florida Bar Rule 4-1.2(c) puts the onus on the lawyer to communicate with the client about limiting the scope of representation: "If not prohibited by law or rule, a lawyer and client may agree to limit the objectives or scope of the

representation if the limitation is reasonable under the circumstances and the client gives informed consent in writing, except that a lawyer giving advice in a short-term limited legal services program under Rule 4-6.6 is not required to obtain the consent in writing." Florida Bar Rule 4-1.2(c). "'Informed consent' denotes the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct." Florida Bar Rules, Chapter 4, Preamble, Terminology: "Informed consent".

<u>Retainer agreements are construed in favor of the client and against the lawyer.</u>

There is a line of Florida cases construing retainer agreements in favor of the client and against the lawyer. *Arabia v. Siedlecki*, 789 So. 2d 380, 383 (Fla. 4th DCA 2001) ("An attorney must be clear and precise in explaining the terms of a fee agreement. To the extent the contract is unclear, the agreement should be construed against the attorney"); *Jaye v. Royal Saxon*, 687 So. 2d 978, 982 (Fla. 4th DCA 1997) (same); *Vargas v. Schweitzer-Ramras*, 878 So. 2d 415, 417 (Fla. 3d DCA 2004) ("… retainer agreements are construed against the attorney and in favor of client.").

**h. Filing a UCC-1 financing statement can only have positive effects for the client.**

Filing a UCC-1 financing statement for a secured loan can have only positive effects for the client. At worst, the UCC-1 financing statement might have no practical effect, in the case where the debtor pays off the loan. There are no advantages in not filing the financing statement and the results can be catastrophic. The rule in Georgia, Illinois, and New York creates certainty, can only be beneficial to the client, and avoids the potential harm of having an unperfected security interest. The opposite rule would have the opposite effect – transaction counsel would have neither the obligation to file a UCC-1 financing statement nor the obligation to tell their clients that they will not do so.

**i. The Court should certify the question to the Supreme Court of Florida.**

Certification is appropriate for a reason unique to this case: this issue touches on the conduct of a Florida attorney, and the Supreme Court of Florida is ultimately responsible for regulating the Florida Bar. The state Supreme Court has two different interests in deciding this case: 1) the usual interest in deciding Florida law and 2) the unique interest in regulating the conduct of Florida Bar members.

**j. Standard for refusal to give a requested jury instruction.**

Refusal to give a requested jury instruction is reversible if three elements are met: "(1) the requested instruction correctly stated the law, (2) the instruction dealt

with an issue properly before the jury, and (3) the failure to give the instruction resulted in prejudicial harm to the requesting party." *Goldsmith v. Bagby Elevator*, 513 F.3d 1261, 1287 (11th Cir. 2008) (quotations omitted). The first element – legal correctness of the proposed instruction – is reviewed de novo. *Fid. Interior v. Se. Carpenters*, 675 F.3d 1250, 1259 (11th Cir. 2012). "[A]n attorney's closing argument or an expert's testimony, no matter how accurate, is no substitute for an instruction issued by the court." *Brink*, 38 F.4th at 925. When the court does not instruct the jury on a basis for liability, that is prejudicial because "in this Circuit a jury is presumed to follow jury instructions." *Id.* at 924 (quotes omitted). The closing arguments of counsel do not save the District Court from error. *Id.* at 925.

**k. The District Court erred in not including a jury instruction correcting Defendant's expert's misstatement about the Florida Bar Rules.**

The District Court should have given the following instruction:

> A lawyer may reveal confidential information, to the extent the lawyer reasonably believes necessary to serve the client's interests, unless it is information the client specifically requires not to be disclosed.

Doc 265 - pg 111:2-6. The instruction was modeled on Florida Bar Rule 4.1-6(c)(1). The instruction was important because the defense liability expert testified that the Florida Bar was at the opposite extreme: that a disclosure of confidential information required express authorization, and that Mr. Bernstein was not even allowed to file a UCC-1 financing statement without the client's instruction for

fear that he might disclose confidential information. This supposed restriction allowed the defense to make the closing argument that Mr. Bernstein had a good reason to not file the UCC-1. Doc 266 - pg 58:18-25 (defense closing).

The District Court generally declined to give jury instructions where the supporting citation was to the Florida Bar Rules. The court reasoned that violation of the rules of professional conduct does not by itself equate to malpractice. Doc 265 - pg 143:25 – 144:4, 156:14-16. The court's statement of Florida law on that point was correct: violating a bar rule is not per se malpractice, although it can constitute evidence of negligence. *Pressley v. Farley*, 579 So. 2d 160, 161 (Fla. 1st DCA 1991).

The problem is that *Pressley* had no application to this instruction. Plaintiff did not request liability on the basis of violating a bar rule, and Plaintiff did not request an instruction that it created a duty. Defendant's expert opined that the Florida Bar was at the opposite extreme: that it implicitly prohibited Defendants from filing a UCC-1 financing statement by prohibiting disclosures of confidential information without express authorization.

The prohibition on disclosing a client's confidential information without authorization does not exist – the relevant Rule says the opposite: "A lawyer may reveal confidential information to the extent the lawyer reasonably believes necessary to: (1) serve the client's interest unless it is information the client

specifically requires not to be disclosed …". Florida Bar Rule 4.1-6(c)(1). The Rule allowed disclosure unless the client specified otherwise – the defense expert said the Rule prohibited disclosure unless the client specifically allowed it.

The jury should have been instructed on what the bar rule actually says in order to correct this misstatement. This does not contradict the principle that violating the Rules is not per se malpractice – Plaintiff's instruction did not state that violating this bar rule constituted malpractice. The instruction is worded in terms of what an attorney is permitted to do, not in terms of what an attorney is required to do. Here, the expert relied on a non-existent rule that prohibited disclosure: the instruction simply indicated that there was no such prohibition.

**l. The District Court erred in refusing to give an instruction on how to resolve ambiguity in the terms of the attorney-client relationship.**

Instructions 22 and 33 are discussed together because they both concern how to resolve ambiguities in the terms of the attorney-client relationship. The main difference is that instruction 33 is derived from three Florida appellate cases while instruction 22 is derived from Rule of Professional Conduct 4-1.2(c) and the preamble's definition of "informed consent".

**i. Both instructions are correct statements of Florida law.**

Proposed instruction 33 states:

> "Ambiguity in the terms of representation is construed against the attorney and in favor of the client. An attorney must be clear and

> precise in explaining the terms of representation to the client. If the terms are unclear, then they are construed against the attorney and in favor of the client."

Doc 265 - pg 154:15 – 156:3; Doc 218 - pg 53.

Oasis cited three Florida appellate cases on construing fee and retainer agreements for this point. *Arabia v. Siedlecki*, 789 So. 2d 380, 383 (Fla. 4th DCA 2001) ("An attorney must be clear and precise in explaining the terms of a fee agreement. To the extent the contract is unclear, the agreement should be construed against the attorney"); *Jaye v. Royal Saxon*, 687 So. 2d 978, 982 (Fla. 4th DCA 1997) (same); *Vargas v. Schweitzer-Ramras*, 878 So. 2d 415, 417 (Fla. 3d DCA 2004) ("… retainer agreements are construed against the attorney and in favor of client.").

Proposed instruction 22 states:

> If a lawyer wishes to limit the scope of his representation, he must obtain the 'informed consent' of his client in writing. 'Informed consent' means that the client agreed after the lawyer communicated adequate information and explanation about the risks and reasonably available alternatives to the proposed course of conduct.

Doc 265 - pg 142:10 – 144:11; Doc 218 - pg 40. This proposed instruction was based on Florida Bar Rule 4-1.2(c) and the preamble's definition of "informed consent".

**ii. The issue was properly before the jury.**

The issue was properly before the jury. When a party argues two legitimate bases of liability, both are properly before the jury. *Brink*, 38 F.4th at 924. Here,

Oasis repeatedly argued that if both sides were silent about a UCC-1, Oasis should still prevail. Doc 262 - pg 178:21 – 179:32 (opening statement on need to discuss the issue with the client and obtained informed consent); Doc 264 - pg 162:17 – 165:16 (expert testimony); Doc 266 - pg 32:6-14 (Oasis closing argument that failure to communicate falls below the standard of care); Doc 132 (Oasis summary judgment motion) - pg 10-11 ("If the jury finds that neither the attorney nor the client ever said anything about UCC financing statements, then legally this ambiguous situation is construed against the lawyer. …"); Doc 143 (response to defense summary judgment motion) - pg 12-13 (same). The attorneys' own liability expert report only addressed the scenario in which both sides were silent about a UCC-1. Doc 133-1 - pg 4-5.

**iii. Refusing these instructions prejudiced Oasis.**

There do not appear to be many cases on prejudice (or lack thereof) from a court's refusal to instruct the jury on how to navigate ambiguity, but Oasis has located an unpublished decision from the Tenth Circuit on this issue. *Rich v. Med-National Inc.*, 1998 U.S. App. Lexis 1344, at 17-18 (10th Cir. Jan. 30, 1998). The relevant issue was contract interpretation under Texas law. *Id.* at n. 3. The plaintiff requested three instructions on contract interpretation, including an instruction that ambiguities were construed against the drafter. *Id.* at n. 1. The court held that certain provisions were ambiguous, so contract interpretation was a factual issue.

*Id.* at 17. "Proper jury instructions regarding contract interpretation thus become critical." *Id.* The court held that the trial court should have given contract interpretation instructions, including the instruction on construing ambiguities against the drafter. *Id.* at 17-18.

Then court then turned to whether the plaintiff was prejudiced by the error. The plaintiff was prejudiced because "[a]t the minimum, they deprived plaintiff of the opportunity to fairly present and the jury to consider a theory of plaintiff's case--ambiguity--which we have determined was an appropriate and timely presented theory." *Id.* at 18. The court reasoned that this effectively deprived the plaintiff of the opportunity to present the ambiguity theory of its case:

> In failing to instruct the jury on its duty to resolve the ambiguity, in failing to provide the jury with the basic tools of contract interpretation, and in failing to direct the jury to construe the contract against Med-National, the court not only erred but did so to the significant prejudice of the plaintiff. These failings deprived the plaintiff of the opportunity to fairly present and the jury to consider a theory of plaintiff's case, i.e., ambiguity. In this case, such deprivation constitutes prejudicial error.

*Id.* at 21.

"[A]n attorney's closing argument or an expert's testimony, no matter how accurate, is no substitute for an instruction issued by the court." *Brink*, 38 F.4th at 925. When the court does not instruct the jury on a basis for liability, that is prejudicial because "in this Circuit a jury is presumed to follow jury instructions."

*Id.* at 924 (quotes omitted). The closing arguments of counsel do not save the District Court from error. *Id.* at 925.

Within this requirement, omitting an instruction can be cured if the substance of the requested instruction is included elsewhere in the instructions actually given. *Goulah v. Ford Motor*, 118 F.3d 1478, 1485 (11th Cir. 1997). Here, there was no instruction on how to deal assess the circumstance in which the parties were silent about a UCC-1. Oasis repeatedly pressed this theory through the case and at trial. Refusing all instructions on how to resolve silence left the jury without a path to find for Oasis since "in this Circuit a jury is presumed to follow jury instructions." *Brink*, 38 F.4th at 924 (quotes omitted). Oasis' counsel addressed it and Oasis' expert addressed it, but "an attorney's closing argument or an expert's testimony, no matter how accurate, is no substitute for an instruction issued by the court." *Brink*, 38 F.4th at 925.

There is inherently an imbalance of knowledge and expertise between the attorney and client. For that reason, both case law and the Rules of Professional Conduct put the burden on the attorney to make things clear to the client. The jury has no way to know that is the law unless the District Court so informs them. Oasis requested – in two different forms – an instruction that the onus is on the attorney.

**m. The District Court erred in granting Defendants' directed verdict motion on breach of contract.**

This case is governed by the Supreme Court of Florida's holding in *Weekley v. Knight*, 116 Fla. 721, 722, 156 So. 625, 626 (1934): "We think there can be no question that one has a cause of action ex contractu against an attorney who neglects to perform the services which he agrees to perform for a client or which by implication he agrees to perform when he accepts employment by a client." *Id.* An intermediate appellate decision with the same holding is *Kartikes v. Demos*, 214 So. 2d 86, 86-87 (Fla. 3d DCA 1968): "A client has a cause of action in contract against an attorney who neglects to perform services he explicitly or implicitly agreed to perform when he agreed to be employed by the client." *Id.*

Both cases hold that a client has a claim against an attorney who does not perform the services he agrees to perform, either explicitly or implicitly, and both cases hold that this is a claim for breach of contract. Here, Mr. Long testified that he instructed Mr. Bernstein to file a UCC-1 financing statement for these loans in particular, that he instructed Mr. Bernstein to file a UCC-1 financing statement for any secured loan, and that Mr. Bernstein agreed to do so. At the directed verdict stage, the District Court was required to credit this testimony. Taking Mr. Long's testimony as true, Plaintiff made out a breach of contract claim under *Weekley v. Knight* and *Kartikes v. Demos*.

The District Court based its decision on the language "when he accepts employment by a client" in *Weekley v. Knight* and "when he agreed to be employed by the client" in *Kartikes v. Demos*. The District Court held that these phrases indicated a requirement under Florida law that the agreement had to be at the beginning of the attorney-client relationship. Since Defendants did transactions for Plaintiff before the Generex transactions, any promise for the Generex transactions was not at the start of the attorney-client relationship, so the District Court reasoned that the promise to file a UCC-1 for the Generex transactions did not constitute a contract claim.

The Court should reverse for three reasons. First, even if the District Court is correct that *Weekley* and *Kartikes* only apply if the promise is at the outset of the attorney-client relationship, Oasis put on evidence to meet that requirement. Trial exhibit P58 (Doc 248-9) is a UCC-1 financing statement that the Defendant firm filed for Oasis for the very first transaction. It was filed on May 15, 2020, and the representation began only 10 days earlier on May 5, 2020.

Second, there is no logical reason why the two circumstances should have different outcomes. If an attorney promises a client to do something and the attorney fails to do it, it should not matter if the broken promise was made at the start of the attorney's employment or the broken promise was made later on. If the attorney promises to do something and fails to do it, then the attorney is just as

culpable and the client suffers the same harm no matter when during the attorney-client relationship it happened.

Third, although there do not appear to be any cases on the District Court's distinction between promises at the start of the attorney's employment versus later, one Florida appellate decision suggests that an attorney's failure to follow instructions during the course of the relationship will still give rise to a contract claim. *Solomon v. Meyer*, 116 So. 2d 37, 38 (Fla. 3d DCA 1959). In that case, a client alleged that he lost funds due to his former attorneys' poor representation in his dealings with a bankruptcy trustee. *Id.* at 38.

> There can be no question that one has a cause of action ex contractu against an attorney who neglects to perform the services which he agrees to perform for a client or which by implication he agrees to perform when he accepts employment by a client. *Weekley v. Knight*, 116 Fla. 721, 156 So. 625. The gist of Solomon's action against his attorneys, as gathered from the complaint before us, is that they failed to advise him of a proper plan of procedure in his business before the bankruptcy court. If Solomon should be able to establish that he did not receive, upon his request, advice which was a necessary part of the performance of the contract between himself as client and the defendants as attorneys, or that his attorneys were negligent in the advice given him, then the fact that the trustee did not follow the terms of a certain contract, would not *necessarily* determine the case.

*Solomon v. Meyer*, 116 So. 2d 37, 38 (Fla. 3d DCA 1959). The language "If Solomon … did not receive, upon his request, advice which was a necessary part of the performance of the contract between himself as client and the defendants as attorneys" is worded as if "upon his request" for advice came after the existence of

the attorney-client contract. This is because "upon his request" suggests that the request is a different act from the creation of the initial contract, but the request is evaluated based on whether the advice sought is "a necessary part of the performance of the contract". Although this case does not directly address the District Court's distinction on the timing of a promise, it suggests that a breach of contract claim against an attorney would not fail simply because the attorney's broken promise came later in the attorney's employment.

This issue is arguably linked with proposed instruction 33 on ambiguity in the terms of representation. The District Court reasoned that the instruction was improper because the contract claims were dismissed. Doc 265 - pg 155:21-24. It follows that if the contract claim not been dismissed, the court would have instructed the jury on ambiguity. That would have given Oasis a path to a plaintiff's verdict on breach of contract even if the jury found that the parties were silent about whether the attorney was expected to file a UCC-1.

**n. The District Court erred in granting a directed verdict limiting damages.**

The District Court erred in limiting Plaintiff's damages under *Fernandes v. Barrs*, 641 So. 2d 1371, 1376 (Fla. 3d DCA 1994) (overruled on other grounds at *Chandris, S.A. v. Yanakakis*, 668 So. 2d 180, 185 (Fla. 1995)), because a plaintiff can prove collectability "with evidence of the original tortfeasor's financial status, insurance coverage, property ownership, and so forth." *Fernandes*, 641 So. at

1376. Here, the evidence included the debtor's consolidated financial statements within 10-K and 10-Q filings showing assets above $40,000,000. Doc 248-12 - pg 97; Doc 248-13 - pg 3; Doc 248-25 - pg 3. The attorneys' damages expert admitted that the goodwill portion was tested at least once per year under GAAP (Doc 265 - pg 46:25 – 47:3, 49:8 – 50:23), that the company was audited under the highest possible standard, PCAOB (id., pg 31:13 – 32:10), and that in the view of the accountant this value was unimpaired at the time of filing (id., pg 47:4 – 48:16, 50:15-16, 52:1-4, 52:12-21, 56:18-24, 57:17 – 58:2).

**F. Conclusion.**

For these reasons, the judgment should be reversed. The Court should either hold that a Florida transaction attorney must file a UCC-1 financing statement for a secured transaction or certify the question to the state Supreme Court. The Court should reverse as to the District Court's refusal to give proposed instructions, and the Court should reverse the District Court's partial grant of directed verdict.

Respectfully submitted,

*/s/ Evan Louis Frank*
Evan Louis Frank
ALAN L. FRANK LAW ASSOCIATES, PC
135 Old York Road
Jenkintown, Pennsylvania 19046
(215) 935-1000

*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because:

   this brief contains 10,554 words, excluding those parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word in Times New Roman, 14-point.

*/s/ Evan Louis Frank*
Evan Louis Frank
ALAN L. FRANK LAW ASSOCIATES, PC
135 Old York Road
Jenkintown, Pennsylvania 19046
(215) 935-1000

*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on August 21, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished using the appellate CM/ECF system.

*/s/ Evan Louis Frank*
Evan Louis Frank
ALAN L. FRANK LAW ASSOCIATES, PC
135 Old York Road
Jenkintown, Pennsylvania 19046
(215) 935-1000

*Counsel for Plaintiff-Appellant*